**SILLS CUMMIS & GROSS P.C.**
Thomas A. Della Croce
William R. Tellado
Megan L. Wiggins
One Riverfront Plaza
Newark, New Jersey  07102-5400
(973) 643-7000
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| PRISTEC REFINING TECHNOLOGIES USA, LLC, EARLE REFINING LLC, EARLE OIL INVESTMENTS, LLC, and T.J. EARLE,<br><br>           Plaintiffs,<br><br>v.<br><br>PRISTEC AG and PRISTEC AMERICA, INC.,<br><br>           Defendants. | Civil Action No._____<br><br>(*Document Electronically Filed*)<br><br><br>**COMPLAINT** |

Plaintiffs Pristec Refining Technologies USA, LLC ("PRT"), Earle Refining LLC ("Earle Refining"), Earle Oil Investments, LLC ("Earle Oil,"), and Thomas J. Earle ("T.J. Earle," and together with PRT, Earle Refining, and Earle Oil, "Plaintiffs"), by and through their undersigned counsel, as and for their Complaint against Defendants Pristec AG ("PAG") and Pristec America, Inc. ("Pristec America," and together with PAG, "Defendants"), allege as follows:

**NATURE OF THE ACTION**

1.     This is an action seeking equitable and injunctive relief compelling Defendants to specifically perform their obligations to Plaintiff PRT, a company formed to commercialize certain oil-refining technology Defendants claim to have created and which Defendants subsequently licensed to PRT through a series of transactions.  Plaintiffs also seek money

damages for Defendants' repeated material breaches of their contractual and fiduciary duties to PRT.

2.      Alternatively, this action seeks equitable and injunctive relief compelling PAG to work in good faith with T.J. Earle and specifically perform under the letter of intent by and between PAG and T.J. Earle executed on March 23, 2017, pertaining to future operations concerning the use and commercialization of Defendants' technology and execute definitive documents concerning these operations.

3.      This action further seeks equitable and injunctive relief to compel Pristec America to specifically perform its contractual obligation to return a refundable deposit paid by Plaintiff Earle Oil for an option Earle Oil declined to exercise, along with monetary damages for Pristec America's failure to return the deposit in a timely fashion.

4.      Moreover, this action seeks damages for Defendants' repeated failures to perform their contractual obligations to Plaintiffs, and for their repeated violation of duties owed to one or more of the Plaintiffs as a matter of law.

## **PARTIES**

5.       Plaintiff Earle Oil is a New Jersey limited liability company formed on January 20, 2016, with its principal place of business at 1800 Route 34, Wall, New Jersey 07719.

6.      The members of Earle Oil are T.J. Earle, W. Robert Earle, II ("Rob Earle") and Michael G. Earle ("Michael Earle" and, together with T.J. Earle and Rob Earle, the "Earle Brothers"), each of whom is an individual domiciled in New Jersey.  Michael Earle is domiciled in Red Bank, New Jersey, and Rob Earle is domiciled in Brielle, New Jersey 08730.

7.      Plaintiff T.J. Earle is an individual who is domiciled in Red Bank, New Jersey 07701.

8.      Plaintiff PRT is a Delaware limited liability company formed on September 14, 2016, with its principal place of business at 1800 Route 34, Wall, New Jersey 07719.

9.      The members of PRT are Steven R. Hays ("Hays"), Walter Gil de Rubio ("Gil de Rubio"), and Plaintiff Earle Refining.

10.     Upon information and belief, Hays is an individual domiciled in Texas with an address at 3314 Falling Brook, San Antonio, Texas 78258.

11.     Upon information and belief, Gil de Rubio is an individual domiciled in New Jersey with an address at 24 Casilda Drive, Freehold, New Jersey 07728.

12.     Plaintiff Earle Refining is a New Jersey limited liability company formed on September 14, 2016, with its principal place of business at 1800 Route 34, Wall, New Jersey 07719.

13.     The members of Earle Refining  are (1) WRE Family 2016 Trust; (2) TJE Family 2016 Trust; and (3) MGE Family 2016 Trust, the trustees and beneficiaries of which are Rob Earle, T.J. Earle and Michael Earle, respectively.

14.      Upon information and belief, Defendant Pristec America is a corporation organized and existing under the laws of Nevada, with its principal place of business at 807 South Main Street, Las Vegas, Nevada 89107.

15.     Upon information and belief, Defendant Pristec America is a wholly-owned subsidiary of Defendant PAG.

16.     Upon information and belief, Defendant PAG is a joint stock company organized and existing under the laws of the Republic of Austria, with its principal place of business in Vienna, Austria.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because it is a civil action, there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

18.     This Court has personal jurisdiction over Defendant Pristec America because it has transacted business in New Jersey in connection with the agreements, breaches thereof, and tortious conduct that give rise to this lawsuit.

19.     This Court also has personal jurisdiction over Defendant Pristec America with respect to Plaintiff PRT's claim against Pristec America for breach of the license agreement between PRT and Pristec America because Pristec America consented to personal jurisdiction being exercised over it by courts located in New Jersey for that purpose.

20.     This Court has personal jurisdiction over Defendant PAG because it has transacted business in New Jersey in connection with the agreements, breaches thereof, and tortious conduct that give rise to this lawsuit.

21.     This Court also has personal jurisdiction over Defendant PAG with respect to Plaintiff PRT's claim against PAG for breach of the license agreement between PRT and PAG, as successor to Pristec America, because PAG expressly consented to personal jurisdiction being exercised over it by courts located in the State of New Jersey for suits arising out of or relating to the license agreement.

22.     Venue is proper in this Court pursuant 28 U.S.C. § 1391(b)(2) and (b)(3) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, and because Defendants are subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

A.      **Origins of the Earle-Pristec Relationship**

23.      The Earle Brothers have a long track record of success in the State of New jersey operating industrial businesses including Earle Asphalt Company and Pure Soil Technologies, Inc.

24.      In 2015, Gil de Rubio introduced the Earle Brothers to Joseph Laura ("Laura").

25.      Laura, a lawyer, represented himself to be the Chairman and President of Defendant Pristec America and a member of the Supervisory Board of Defendant PAG. Defendant PAG purported to own certain innovative oil-refining technology that PAG had licensed to Defendant Pristec America (the "Pristec Technology").

26.      During 2015, the Earle Brothers (and at times, their counsel) met with Gil de Rubio and Laura in New Jersey approximately ten times to discuss a potential business relationship with Pristec America, whereby the Earle Brothers would bring their considerable business experience and capital to a joint venture with Defendants.

27.      These meetings were in addition to countless telephone conferences that were conducted by the Earle Brothers, and their counsel, from New Jersey and the exchange of countless emails between representatives of Defendants and the Earle Brothers and their representatives in New Jersey.

28.      These meetings and communications culminated in a letter of intent dated July 2, 2015, and an amended and restated letter of intent dated September 30, 2015 (collectively, the "PNE Letters of Intent").

29.      In accordance with the terms of the PNE Letters of Intent, the parties executed definitive agreements effectuating the new business in the form of a joint venture entity called Pristec Northeast, LLC ("PNE").  Laura personally appeared at the New Jersey offices of the

Earle Brothers' counsel on December 14, 2015, for the purpose of finalizing negotiations on the definitive documents.

**B.      The First Joint Venture:  PNE And The Terminal Business**

30.      PNE was formed on or about January 20, 2016, in accordance with the terms of the PNE Letters of Intent with Pristec America, Earle Oil, Gil de Rubio and Hays as members.

31.      In connection with and anticipation of the Earle Brothers' investment in PNE, the Earle Brothers retained various consultants with specialized experience and knowledge concerning the business that PNE would be engaged in, including Daniel Finnochi.

32.       Further, Earle Investments, LLC ("Earle Investments"), a non-party New Jersey limited liability company owned by the Earle Brothers, entered into a Consulting Services Agreement dated December 23, 2015, with PetroLegacy Consulting, LLC, a Texas limited liability company owned by Hays ("Petro").

33.      While the PNE Letters of Intent did not contemplate Hays being a member of PNE, the parties agreed to add Hays as a member based on his contributions to the future venture as a consultant for Earle Investments.

34.      To effectuate the PNE Letters of Intent, the parties executed the Operating Agreement of Pristec Northeast, LLC dated January 15, 2016 (the "PNE Operating Agreement").

35.      The PNE Operating Agreement provides that PNE would use the Pristec Technology to provide services and technology in refining terminals throughout certain specified areas designated in the PNE Operating Agreement (the "Terminal Business").

36.      Pursuant to the terms of the PNE Operating Agreement and an Intellectual Property License effective January 15, 2016 (the "PNE License Agreement"), Pristec America sublicensed the Pristec Technology, along with know-how and other associated intellectual

property, to PNE in exchange for a license fee paid by Earle Oil to Pristec America in the amount of $850,000.

37.     Paragraph 1(d) of the PNE Operating Agreement granted Earle Oil an option to pay an additional license fee of another $850,000 (the "Southeast License Fee") in consideration for which the territory for the Terminal Business of PNE would be expanded to include the southeastern United States (the "Southeast Option.")

38.     Pursuant to Paragraph 1(d) of the PNE Operating Agreement, Earle Oil delivered a deposit of $150,000 (the "Deposit") to Pristec America to be credited against the Southeast License Fee if the Southeast Option was exercised by Earle Oil on or before April 15, 2016.  If Earle Oil chose to exercise the option, it would transfer the remainder of the Southeast License Fee ($700,000) within a day after exercising the option.

39.     If Earle Oil elected not to exercise the Southeast Option, the return of its $150,000 Deposit was to be governed by the Investor Rights Agreement dated January 14, 2016 (the "Investor Rights Agreement").

40.     Simultaneously with the execution and delivery of the PNE Operating Agreement and the PNE License Agreement, the Defendants (and non-party Innovative Crude Technologies, Inc., upon information and belief, a New Jersey corporation which is a wholly owned subsidiary of PAG), entered into the Investor Rights Agreement with the Earle Brothers and Earle Investments, which was designated as the representative of the Earle Brothers in connection certain rights they bargained for as investors in the Pristec Technology.

41.     Paragraph 3 of the Investor Rights Agreement provides that if Earle Oil decided not to exercise the Southeast Option, it could either convert the Deposit into equity in Defendant PAG, or one of its subsidiaries, or demand a return of the Deposit in cash.

42.     Upon demand for return of the Deposit, the Investor Rights Agreement requires Pristec America to comply within ten (10) business days, and provides that until the Deposit is returned, (i) the Deposit accrues interest at five percent (5%) per annum from April 16, 2016, until its return; and (ii) the Southeast Option, and PNE's rights thereunder, remain effective until the Deposit is returned.

43.     In or around January 2016, Earle Oil declined to exercise the Southeast Option and demanded a return of the Deposit.

44.     On January 6, 2016, Laura emailed T.J. Earle promising that Pristec America would return the Deposit within sixty (60) days.

45.     By letter from its counsel dated February 2, 2017, Earle Investments again demanded a return of the Deposit on behalf of Earle Oil.

46.     To date, Pristec America has failed to return the Deposit to Earle Oil.

**C.      Initial Bad Faith by Defendants Under The PNE Agreements**

47.     While working for Earle Investments as a consultant, Petro and Hays were working on developing applications for the Pristec Technology to be used in refineries (the "Refinery Business").

48.     Paragraph 23(b) of the PNE Operating Agreement granted PNE substantial rights, including the right to receive one hundred percent (100%) of the revenue generated at refineries in the United States, and twenty-five percent (25%) of the revenue generated at refineries outside the United States, if those refineries used the applications of the Pristec Technology developed by Petro and Hays and were shown to reduce residual waste in the refining and production of oil by as much as fifty percent (50%).

49.     In connection with PNE's business, PNE required Defendants to provide PNE with a demonstration of the equipment that implemented the Pristec Technology to show

customers that the Pristec Technology could be used for its intended application in refineries to reduce residual waste in the refining and production process.

50.     Defendants advised PNE that Defendants were planning on performing a demonstration for Defendants' customers in Vienna, Austria, and Defendants represented that they would produce a demonstration pilot of equipment that implemented the Pristec Technology required by PNE upon Earle Oil's payment of $100,000, and perform the demonstrations at the same time.

51.     Pursuant to the terms of a letter agreement dated March 15, 2016 (the "March 2016 Letter Agreement"), and based on Defendants' representations that Earle Oil assumed were made in good faith, Earle Oil provided Pristec America with an additional $100,000 to be used by Pristec America to produce a demonstration of pilot equipment implementing the Pristec Technology for use in refineries.

52.     In May 2016, Plaintiffs traveled to Vienna, Austria to view the planned demonstration; however, Defendants performed only the demonstration for their customers and did not perform the demonstration required by Plaintiffs.

53.     In the March 2016 Letter Agreement, the parties also agreed to certain amendments to the PNE Operating Agreement, including language which clarified PNE's rights under paragraph 23(b) by deleting reference to "as much as fifty percent (50%)" and replacing it with "up to one hundred percent (100%)."

54.     Based on the substantial rights Earle Oil believed it had under the PNE Operating Agreement and the March 2016 Letter Agreement, Earle Oil and Petro invested significant time and resources in developing applications for the use of the Pristec Technology in refineries, and developing customers to purchase those applications.

55.     In connection with these efforts, Petro worked with non-party Ronald Tabery ("Tabery"), who had previously signed a Confidentiality and Non-Disclosure Agreement with Petro on October 31, 2015 (the "Tabery NDA").

56.     Notwithstanding the clear language of the PNE Operating Agreement, as amended by the March 2016 Letter Agreement, granting PNE substantial rights in and to the Refinery Business,  Defendants took the position that PNE had only limited rights in and to the Refinery Business.

57.     Specifically, on May 9, 2016, Laura and T.J. Earle were in Vienna together for the demonstration of equipment implementing the Pristec Technology (which demonstration was paid for by Earle Oil under the terms of the March 2016 Letter Agreement).

58.     At that time, having already received $1,100,000 from Earle Oil, Laura advised T.J. Earle that Defendants did not intend to honor the provisions concerning the Refinery Business.

59.     During the following weeks, the parties attempted to resolve the dispute concerning the Refinery Business and ultimately scheduled a July 5, 2016 meeting to resolve the issues in dispute.

60.     In advance of the July 5, 2016 meeting, Earle Oil learned that Defendants were colluding with Tabery to steal Earle Oil's and Petro's confidential and proprietary information related to the Refinery Business including (a) the applications utilizing the Pristec Technology, (b) customers being developed by Earle Oil and Petro, and (c) economic models developed for such customers.

61.     The Tabery NDA specifically covered information, "whether the information pertained to Petro or another party to which Petro had [a] confidentiality obligation."  Pursuant to Section 6 of the Consulting Agreement between Earle Oil and Petro, Petro had an obligation to

maintain and not disclose Earle Oil's confidential information to any person, form or corporation outside Earle Oil.

62.     Given the competitive nature of the oil refining business and the innovative nature of the Pristec Technology, Earle Oil relied upon non-public proprietary and confidential information that it developed over time at substantial expense and utilizes solely to pursue its own business interests.

63.      By email dated June 22, 2016, Tabery advised T.J. Earle that Tabery would no longer be providing services to Earle Oil and Petro and would instead pursue other opportunities.

64.     A subsequent review of Tabery's e-mail account by Earle Oil disclosed that Defendants were working behind the scenes with Tabery and against their joint venturer, Earle Oil.

65.     Specifically, Tabery was disseminating Earle Oil's confidential information to Defendants, and others, without Earle Oil's knowledge or permission.

66.     On June 3, 2016, Tabery disseminated information concerning Earle Oil's economic models for a potential customer ("Customer No. 1").  Customer No. 1's economic models were also sent to Tabery's personal e-mail address, presumably to enable Tabery to misappropriate and disseminate the information without detection.

67.     On the same day, Tabery was providing similar confidential information concerning Earle Oil's economic models for Customer No. 1 to Ron Rose at Value Creation Strategies Holdings, LLC, a company interested in possible investment in the Pristec Technology.

68.     Three days later, on June 6, 2016, Tabery forwarded by e-mail Earle Oil's form of customer license agreement to Anthony Sichenzio ("Sichenzio") and Alex Herrera, who were, at

that time, upon information and belief, members and/or officers of one or more of the Defendants.

69.     Upon information and belief, Tabery signed a Consulting Services Agreement with Pristec America on June 11, 2016, eleven (11) days before Tabery advised T.J. Earle that Tabery would no longer be providing services to Earle Oil and Petro.

70.     The expense report submitted by Tabery by email on June 22, 2016, indicated that Tabery met with another customer being pursued by PNE for the Refinery Business ("Customer No. 2"), on June 16, 2016, just days after Tabery had been retained by Pristec America but while Earle Oil still believed he was acting on its behalf and while he was still being paid by Earle Oil.

71.     As further evidence of Tabery's and Defendants' wrongdoing, Earle Oil also discovered a letter from PAG to Customer No. 1 dated June 16, 2016 advising that Tabery was now representing PAG.

72.     The reasons for the Defendants' unwillingness to honor the express terms of the PNE Operating Agreement and their hostility toward their loyal and well-invested joint venturer came into focus -- Defendants were working with others to misappropriate confidential and proprietary information from Earle Oil and to undermine Earle Oil in the market rather than work with Earle Oil as the PNE Operating Agreement and PNE License Agreement required.

73.     On June 27, 2016, counsel for Petro delivered a cease and desist letter to Tabery and counsel for Earle Oil delivered a cease and desist letter to Pristec America.

D.     **The Second Joint Venture:  PRT And The Terminal Business**

74.     In an effort to resolve the ongoing disputes concerning the Defendants' conduct and the Refinery Business, and notwithstanding Defendants' collusion with Tabery, Defendants and Earle Oil did in fact meet, with counsel, in the Newark, New Jersey office of Earle Oil's counsel on July 5, 2016.

75.     The parties subsequently entered into a memorandum of understanding regarding the terms of a resolution of their disputes, and over approximately the following two months, negotiated the terms of definitive documents effectuating this memorandum of understanding.

76.     The ultimate result of the negotiations was the creation of a new company to pursue the Refinery Business, PRT.  On or about September 14, 2016, the parties executed definitive documents, including the Operating Agreement of PRT dated as of September 14, 2016 (the "PRT Operating Agreement").

77.     The original members of PRT were Plaintiff Earle Refining, Defendant Pristec America, Hays and Gil de Rubio.

78.     Originally, Earle Refining had a 21% economic interest and a 25% voting interest; Pristec America had a 75% economic interest and a 75% voting interest; Gil de Rubio had a 2% economic interest only; and Hays had a 2% economic interest only.

79.     The PRT Operating Agreement states in Section 1(d) that PRT's purpose is to provide the **"Systems"** (defined as "hydrogen, carbon, and sulfur activators," and any other "activators, equipment, systems or processes developed by [Pristec America] which can be used in petroleum refineries"), **"Technology"** (defined as "the technology, know-how and other intellectual property (a) licensed by [Pristec America to PRT] pursuant to the terms and conditions of [a concurrently-executed license agreement], and (B) developed by [Pristec America] which can be used in petroleum refineries") and "**related services**" to all petroleum refineries in the United States, on an exclusive basis.

80.     In exchange for receiving an exclusive license to the Systems, Technology and related services, PRT agreed to pay Pristec America an exclusive nonrefundable license fee of $1,500,000.  That license fee was funded by a capital contribution by Earle Refining to PRT in

the full amount of the license fee and increased the total amount invested in the Pristec Technology by the Earle Brothers, through their companies, to $2,600,000.

81.     Pursuant to Section 7(f) of the PRT Operating Agreement, Earle Refining was also to receive specifications from Pristec America, which were necessary to construct the first "System" required under the PRT business plan approved by the PRT board of directors.

82.     Concurrently with the PRT Operating Agreement, PRT and Pristec America entered into an Equipment Sales Agreement and Exclusive Intellectual Property License dated as of September 14, 2016 (the "PRT License Agreement"), pursuant to which -- in accordance with the terms of the PRT Operating Agreement -- Pristec America agreed to sell certain equipment and sublicense the Pristec Technology to PRT.

83.     Under Section II.1 of the PRT License Agreement, Pristec America agreed (a) to sell PRT the "Equipment" (defined in the PRT License Agreement as "any equipment developed by Pristec America that can be used in refineries," including but not limited to the equipment described on Exhibit A to the PRT License Agreement), and (b) to deliver and install the Equipment at a designated refinery within the United States within 180 days from the date PRT orders it.

84.     The business model of PRT, and the basis for Earle Refining's investment in PRT, is based on Pristec America's ability to manufacture, install, and deliver the System and Equipment for testing and use in the oil refinery market.

**E.**     **Hiring of Consultants**

85.     The Earle Brothers, as experienced business owners and operators, recognized the need to involve persons with specialized experience as the companies -- first PNE and subsequently PRT -- pursued their goal of commercializing Defendants' Pristec Technology.

86.     To that end, beginning even before the definitive documents forming PNE were executed, the Earle Brothers, through the appropriate business entities, undertook to engage experienced consultants, including, as noted above, Daniel Finnochi.

87.     T.J. Earle, as manager of PRT, also caused PRT to continue the relationship with Hays and Petro in connection with PRT and PRT's mission to commercialize the Pristec Technology for use in the refinery industry, entering into a consulting agreement effective September 1, 2016, pursuant to which Hays and Petro would provide PRT with services including oil refining, and economic, administrative, and commercial information.

88.     PRT, through T.J. Earle as its manager, also hired Michael Pesch, another respected consultant with significant and high-level experience in the oil refining industry, to help commercialize the Pristec Technology.

89.     Hays and Pesch have played, and continue to play, significant roles in assisting PRT further its business plans and to resolve issues created by Defendants' delays and failure to provide the Systems and Equipment required by the governing agreements, including the PRT Operating Agreement and the PRT License Agreement.

90.     Plaintiffs have incurred significant costs and expenses in connection with the engagement of consultants necessary to commercialize Defendants' Pristec Technology.

**F.     Pristec America Repeatedly Fails to Perform, PAG Purports to Step In, and PAG Also Fails to Perform**

91.     T.J. Earle, as manager of PRT, scheduled the first meeting of PRT's board of directors for September 29, 2016, at PRT's offices in Wall, New Jersey, and circulated an agenda for the meeting.

92.     Among the topics to be discussed were PRT's business plan, the progress of a demonstration of equipment utilizing the Pristec Technology in Vienna, Austria, and a timeline of certain required testing and a timeline for deliverables.

93.     Laura then informed T.J. Earle that he would be unable to attend the meeting, requiring it to be rescheduled.

94.     The rescheduled Board meeting was held on October 12, 2016, at PRT's offices in Wall, New Jersey.  It was attended by the Earle Brothers, Laura, Sichenzio, Frank Scaraggi, and Gil de Rubio, all in person, and by Ruediger Nuerk ("Nuerk") (of Pristec AG), Miguel Delgado (of Pristec AG), Hays, and Michael Pesch, by telephone.

95.     At the October 12 meeting, the board approved the PRT budget and business plan, which included a multi-phase plan with customer and installation targets beginning in 2017, and critical dates from September to December 2016 for design, testing, building, and installation events needed to permit alpha testing of the Pristec Technology.

96.     Under the business plan, alpha testing was to take place in the United States from January to March 2017.

97.     For any sales, licensing, or testing of the Pristec Technology with any customers, PRT must have the Pristec Technology available.

98.     However, Pristec America, which, under the PRT Operating Agreement and PRT License Agreement, was required to supply the Systems, Equipment, and Pristec Technology to PRT, repeatedly failed to deliver the Systems, Equipment, and Pristec Technology to PRT, including any specifications or designs for the modules, or for the activators that are to reside in the modules.  In other words, Pristec America has failed to deliver any of the items it was required to supply, to the company, and this failure continues to date.

99.     These failures to perform included without limitation to (a) a complete failure to provide the Equipment, System, and Pristec Technology to PRT; (b) repeated misrepresentations regarding dates when necessary design and testing information would be complete and/or available; and (c) repeated misrepresentations regarding the availability of demonstration equipment to be provided to PRT.

100.     A key component of the Pristec Technology that Pristec America licensed to PRT was a series of activators, the portion claimed to be proprietary.

101.     Beginning in late October 2016, Pristec America repeatedly represented to PRT that the designs for these activators would be completed by a particular time, thereby permitting PRT to place orders for them, and thus allowing PRT to proceed with the approved business plan.    Pristec America also repeatedly changed its position regarding the availability of demonstration equipment that was located in Vienna, Austria that was to be sent to the U.S. to be used by PRT for testing and demonstrations.

102.     Pristec America repeatedly failed to meet its own deadlines, thus preventing any aspect of PRT's business plan from progressing.

103.     In early October 2016, because Pristec America was unwilling and/or unable to provide PRT with a design for the non-proprietary module that would contain and enable use of the activators, T.J. Earle, as PRT manager, engaged an engineering firm, Polaris Engineering, Inc.,  to design the module, such that the module could be designed according to the standards of the United States refinery market, so that the system could be assembled upon receipt of the activators.    However, this design cannot be finalized without the activator designs from Defendants.

104.     During a weekly PRT meeting the first week of November 2016, Pristec America represented that the activator designs would be completed by approximately the week of

November 21, 2016, at which time an order for them could be placed, with delivery anticipated eight to twelve weeks from order, *i.e.*, in February 2017.

105.   Pristec America again represented to PRT on a November 11, 2016 call that the activator design work was on schedule.  T.J. Earle's subsequent summary of the call, circulated to the parties, reflected that "It is the intention of the group to order these activators upon completion of engineering for a future module.  Build time estimated 8-12 weeks."

106.   On November 18, 2016, Pristec America represented to PRT that the activator design work would likely be completed the following week, in a form ready to be built and with no further design work needed.

107.   On December 1, 2016, Laura represented to T.J. Earle that the design of one of the activators was complete.

108.   PRT, through T.J. Earle and Hays, requested certain information for the completed activator to ensure that it complied with U.S. standards and to address any issues before the design was completed on the remaining activators.

109.   Defendants failed to provide this information.

110.   Laura next told T.J. Earle that the activator design work would be completed at the end of the week following December 4, 2016, at which time an estimate and time frame for building the activators could be provided.

111.   On December 12, 2016, T.J. Earle expressed concern to Pristec America that the activator designs were still not done, noted that the module designs could not be completed without the activator designs, and noted that customer and investor meetings could not happen without a complete design.

112.   On December 14, 2016, T.J. Earle sent a letter to Laura, again noting that the module design could not be finalized without the activator designs, which were still outstanding

from Pristec America, requesting clarification as to the reasons for the delay and asking when the designs would be provided to PRT.

113.    The letter also confronted Laura about payments Pristec America was demanding PRT make for testing, contrary to PRT's board-approved business plan and budget and without any input from PRT.  Nevertheless, T.J. Earle's December 14, 2016 letter agreed that PRT would make these payments if Pristec America agreed that PRT owed nothing further and confirmed that PRT owns the work product and test results that were the subject of the charges.  The letter also warned that PRT would pay no further bills without an approved purchase order prior to the expenditure of funds.

114.    Laura agreed to these terms on behalf of Pristec America, and, on December 15, 2016,  promised that the activator designs were to be provided the following week, with building of the activators beginning in February 2017, and delivery of "complete units" by the end of April 2017 or beginning of May 2017 if built in Europe.

115.    On December 5, 2016, and on December 15, 2016, PRT wired Pristec America a total of $75,000, which Pristec America represented would be used, in part, to pay the engineering firm working on the activators.

116.    On a December 16, 2016 conference call, Laura and Nuerk stated that they believed the activator designs would be completed in early January 2017, with information regarding compliance with U.S. standards to be ready by December 21, 2016, and that a proposal for building the activators could be expected by January 13, 2017.  As noted, PRT's module engineer could not finish its module design until the design information for the activators was completed and provided to PRT.

117.    On December 21, 2016, December 23, 2016, and December 26, 2016, T.J. Earle asked Laura for an update on the status of the activators.  Laura failed to provide any information on the status.

118.    In a December 26, 2016 email to PRT's board members, T.J. Earle noted the still-outstanding issue of activator design and the status of the demonstration unit, and suggested a meeting or conference call of the PRT board of directors, which never occurred.

119.    T.J. Earle also noted that the failure of Pristec America and PAG to respond to and support the efforts of PRT was making him concerned whether Defendants were in fact willing to bring the subject technology to the market, as required by the terms of the PRT Operating Agreement and PRT License Agreement, or whether Defendants merely intended to use the technology as a basis to raise funds from investors.

120.    On January 2, 2017, and again on January 10, 2017, T.J. Earle observed to Pristec America and PAG that nothing had been accomplished towards the PRT business plan, and Defendants had failed to respond to the numerous inquiries concerning the activators and other outstanding issues.

121.    In view of Defendants' failure and refusal to provide even basic information relative to the status and development of the technology to PRT -- which technology is a cornerstone of PRT's business plan, and a necessary predicate for PRT to carry out the very purposes for which it was formed -- Earle Refining, though a letter from counsel on January 19, 2017, provided notice to Pristec America of Pristec America's material breaches of the PRT Operating Agreement and PRT License Agreement, and advised that Pristec America had intentionally misrepresented its ability to perform under those agreements to fraudulently induce Earle Refining to invest in PRT.

122.    Earle Refining also advised that Pristec America's promises regarding the status and expected completion date of the activator design were empty, and demanded that Pristec America cure its breaches by the following week by (i) paying the engineering firm completing the activator designs, and (ii) delivering the outstanding activator designs to PRT.

123.    Several days after Earle Refining sent the January 19, 2017 letter, Earle Refining learned that PAG had terminated Pristec America's license to the Pristec Technology based, in part, on PAG's assertion that Pristec America had used the license agreement to commit fraud.

124.    In fact, Nuerk advised T.J. Earle that he had documentary proof of Pristec America's fraud.

125.    Pristec America did not advise PRT or any of the other Plaintiffs that the license had been terminated.

126.    On January 25, 2017, Pristec America, through Laura, responded to Earle Refining's January 19, 2017 letter and disputed the assertions made therein.  Laura's January 25, 2017 letter acknowledged the delays, but claimed that Pristec America remained committed to the venture.

127.    In a letter to Laura from Earle Refining's counsel dated January 27, 2017, Earle Refining advised Pristec America that Earle Refining had learned that Pristec America's license to PAG's Pristec technology had been terminated, that this fact rendered Pristec America unable to perform under the PRT Operating Agreement and PRT License Agreement, and that Pristec America's material omission was further evidence of Pristec America's scheme to defraud Earle Refining and PRT.

128.    PRT also advised in the January 27, 2017 letter that Pristec America's loss of its license to the Pristec Technology constituted a material and incurable breach of the PRT Operating Agreement and PRT License Agreement, and that breach constituted a dissociation

event under the PRT Operating Agreement stripping Pristec America of its membership interest in PRT.  Consequently, Pristec America is no longer a member of PRT.

129.    Over the ensuing weeks, Earle Refining and Pristec America continued to correspond regarding their various disputes over Pristec America's conduct.

130.    Upon information and belief, Pristec America challenged the termination of its license from PAG.

131.    Upon information and belief, notwithstanding that PAG had alleged that it had a valid basis to terminate the license agreement with Pristec America, including but not limited to, the purported fraud committed by Pristec America, PAG reinstated and/or rescinded its termination of the Pristec America-PAG license agreement.

132.    Notwithstanding the reinstatement of the license agreement, upon information and belief, PAG acquired the balance of the outstanding stock in Pristec America and non-party Innovative Crude Technologies, Inc. from Laura and Sichenzio thereby making those companies wholly owned subsidiaries of PAG.

133.    PAG's counsel also provided Earle with correspondence evidencing PAG's attempts to remove Laura from positions as an officer, director and signatory on bank accounts for the various companies.

134.    As Pristec America and PAG dealt with the dispute between them, PRT attempted to continue its efforts to develop PRT's business based on the belief that Laura was the main problem and PAG's commitment to remove him from the fold would improve the situation.

135.    On January 31, 2017, T.J. Earle, as manager of PRT, proposed restarting the weekly PRT conference calls, which had stopped due to the material breaches by Pristec America, with the resumed calls to be attended by PAG and PRT staff only.

136.    PAG and PRT also executed a License Performance Guaranty, effective January 1, 2017 (the "Guaranty").

137.    Pursuant to the Guaranty, if Pristec America does not or cannot perform its obligations under the PRT License Agreement, PAG agreed "to perform all of Pristec America's obligations under the [PRT License Agreement]" immediately upon a demand by PRT.  PAG also represented that it had reviewed, and that it could fully perform the obligations of Pristec America under, the PRT License Agreement.

138.    PAG also agreed pursuant to the Guaranty that, if the Pristec America-PAG license agreement was terminated, the Guaranty would be a self-executing amendment to the PRT License Agreement with PAG having all of the rights and obligations of Pristec America thereunder, and those obligations being enforceable by PAG against PRT.

139.    In the same time period, PAG represented to PRT that it was taking over Pristec America and planned to oust Laura from his positions with several Pristec-related companies due to what PAG described in a letter to investors as "fraud" as well as a pending SEC investigation into Laura and Pristec America.  PAG's Nuerk also referenced PAG's plan to partner directly with Plaintiffs.

140.    Although the PRT conference calls resumed in early February 2017, and were held between PAG and PRT until April 11, 2017, PAG and Nuerk continued the pattern of delay, misrepresentations, and failure to provide any equipment or design information needed for PRT to carry out its intended business.

141.    By way of example, PAG repeatedly represented that it had engaged Voest-Alpine, a large, publicly held manufacturing company, to build the activators.

142.    However, PAG repeatedly concocted excuses why Voest-Alpine was not able to produce the activators by the promised deadlines.

143.    In early February 2017, on a PRT conference call, the parties discussed PRT's business plan and the System and Equipment, including a representation from PAG that it would have a proposal for building the activators by February 10, 2017, including price and timing information, and information regarding compliance with U.S. standards.

144.    PAG failed to meet its own February 10, 2017 deadline.

145.    On February 21, 2017, PAG advised that it expected to receive complete and accurate activator designs, which it would then provide to the builder of the activators, and expected the builder's quote and delivery estimate on March 7, 2017.

146.    PAG failed to meet the March 7, 2017 deadline.

147.    On March 14, 2017, PAG again represented that it expected completed activator designs within a week, and the activator builder to quote a timeline the next week.  PAG also told PRT that it could place an order for the activators when the estimate was complete, *i.e.*, the next week, and agreed to send PRT drawings immediately.

148.    PAG never provided the promised drawings.

149.    On March 21, 2017, PAG stated that the activator design and building quote would be finished that week, and that PAG would give the design information to PRT "now," and the quote upon receipt from the builder.

150.    PAG failed to provide PRT with either the design information or the quote from the builder.

151.    On March 28, 2017, PAG told PRT that the activator builder was not happy with PAG's delays in giving it business, and requested that T.J. Earle participate in a call with the builder.  PAG made similar statements on April 5, 2017.

152.    PAG never arranged the promised call between T.J. Earle and the activator builder.

153. Eventually, Nuerk advised PRT that Voest-Alpine had advised PAG that it would not build the activators because of the numerous misrepresentations made to Voest-Alpine by Laura and Pristec America.

154. On April 11, 2017, PAG represented to PRT that it had identified a new potential activator builder, would arrange a call the next day that included T.J. Earle, and would also speak to a potential builder identified by the company PRT engaged to design the module.

155. Throughout April and May 2017, PRT continued to express concern about PAG's failure to provide activators to PRT, and failure to set up discussions with a potential activator builder, including securing a non-disclosure agreement from the builder.

156. PAG failed to provide any response to PRT and failed to provide PRT with any of the outstanding information concerning the activators.

157. In fact, for approximately five weeks starting on or about April 21, 2017, Defendants failed to respond to any of Plaintiffs telephone calls, messages, e-mails and letters from Plaintiffs' counsel seeking status updates as to the activators, comments to draft documents provided to Defendants on April 21, 2017, and other inquiries.

158. Defendants finally responded and on a May 30, 2017 telephone call between T.J. Earle, Laura, and Nuerk, T.J. Earle asked for an update on the status of the activators. Nuerk responded that he was waiting for a proposal to build the activators and expected to receive it the following week.

159. On June 8, 2017, and June 12, 2017, T.J. Earle sent emails to Nuerk and Laura again asking for the status of the activator proposal that Nuerk said he would have by the end of the week following the May 30, 2017 telephone call.

160. To date, Nuerk and Laura have not responded to these e-mails.

161.    In addition to the still-ongoing issues concerning the activators, design, and price information that has never been provided to PRT, PAG also advised PRT during their conference calls that certain equipment could be shipped to the United States for demonstration and testing purposes.

162.    However, PAG on multiple occasions changed the expected dates and conditions under which the equipment would be shipped to the United States.

163.    For instance, Nuerk advised PRT that activator units needed by PRT were located in Venezuela and could be shipped to PRT if PRT paid the shipping costs.

164.    On February 23, 2017, PRT wired $9,500 to PAG's designee in Venezuela to cover the shipping costs.

165.    On March 21, 2017, contrary to its earlier representations, PAG informed PRT that it would not send the equipment to the United States at all unless PRT agreed to pay $300,000 in additional fees.

166.    PRT refused to pay the $300,000 and Defendants represented they would return the $9,500.  PRT has to date not received the $9,500 back from Defendants.

167.    Defendants' material breaches of their contractual and legal duties and fraudulent conduct have harmed Plaintiffs.  For instance, PRT and its consultants have held meetings with various potential customers for the Pristec Technology, but were unable to proceed due to Defendants' failure to provide even basic information that these customers required in order to consider using the Pristec Technology.

168.    Without the Systems or Equipment or other design and pricing information, PRT has been prevented from carrying out any portion of its business plan, including selling or licensing the Pristec Technology to any refineries, and has been denied any benefit in exchange for the substantial amounts of money it invested in the Pristec Technology, including the

$2,350,000 license fees paid under the PRT License Agreement, and the time, effort, and know-how it has contributed to build PRT's business.

## G.    Earle And Pristec AG Letter Of Intent

169.    Following PAG's failure to perform its obligations and duties to PRT and the dissociation of Pristec America, Plaintiffs once again negotiated in good faith to resolve the disputes and continue working with Defendants to reach a resolution of the disputes to allow the parties to develop and commercialize the Pristec Technology.

170.    Specifically, as PRT began working directly with PAG beginning in or about February 2017 to commercialize the Pristec Technology, PRT's manager, T.J. Earle, negotiated with PAG to formalize the relationship between the companies, in view of Pristec America's failure to perform, PAG's termination of the license agreement between PAG and Pristec America, and PAG's purchase of Pristec America.

171.    The result of these negotiations was the agreement memorialized in a letter of intent signed on March 23, 2017, by T.J. Earle, as President of the Earle Companies, and Nuerk, as CEO of PAG (the "Letter of Intent"), to create a new company called Pristec USA (referenced in the Letter of Intent as "NEWCO") and combine the Terminal Business and Refinery Business therein.

172.    The Letter of Intent memorializes the agreement between T.J. Earle and PAG, pursuant to which the parties would create NEWCO, which would have the exclusive license rights to the Pristec Technology for refineries in the United States and Canada and their affiliated terminals.

173.    The agreement contains all necessary and material terms for NEWCO, including but not limited to, the percentage of ownership and voting rights for NEWCO, how NEWCO would be managed, the composition of its executive board, the treatment of PAG's ownership

interest in terminal operations in the United States and Canada based on NEWCO's revenues, the terms under which NEWCO could purchase activators and software from PAG and its vendors, and the deadline for PAG and its vendors to produce and deliver the activators and software to NEWCO.

174.    PAG further agreed to provide certain information, including the external dimensions of the activator, so the module assembly could be completed, and to be responsible for the delivery and installation of the software and setup.

175.    An essential requirement of the agreement reflected in the Letter of Intent is for NEWCO to be created, such that the other aspects of the agreement can be effectuated, and for the parties to work together and negotiate in good faith to execute definitive agreements.

176.    On several occasions after the Letter of Intent was signed, Nuerk of PAG and T.J. Earle (by themselves and though counsel) discussed the creation of NEWCO and the necessary agreements.

177.    Counsel for T.J. Earle and counsel for PAG met at the New Jersey office of T.J. Earle's counsel to discuss the structure of NEWCO and it was agreed by the parties to create NEWCO by way of a merger of PNE into PRT.

178.    On April 21, 2017, April 24, 2017, and April 25, 2017, counsel for T.J. Earle sent PAG's counsel draft documents to create NEWCO and effectuate the terms of the agreement reflected in the Letter of Intent.

179.    Neither T.J. Earle nor his counsel received any response to these drafts.

180.    By telephone on May 30, 2017, Nuerk and Laura (who had reemerged on the scene at this time) continued the pattern of delay and misrepresentation by claiming their attorney never forwarded the drafts to them.

181. On June 7, 2017, counsel for T.J. Earle sent the draft documents directly to Nuerk and Laura by email.

182. To date, PAG has refused to sign the documents or negotiate in good faith concerning NEWCO.

183. PRT learned that, while it was negotiating the Letter of Intent, and six (6) days before signing the Letter of Intent with T.J. Earle, PAG had signed agreements with a company created by Tabery, the former consultant from Petro who Pristec America had poached from Petro in 2016 and with whom Defendants colluded to misappropriate confidential information and customers from Earle Oil and PRT (the "PAG-Tabery Agreements").

184. The PAG-Tabery Agreements were, with the exception of the names of the parties and certain other details, nearly identical to the agreements between Pristec America and PNE, and between Pristec America and PRT, and appear to have been based on the drafts/templates prepared by Plaintiffs' counsel.

185. Moreover, it appears that the territories/areas PAG agreed to provide to Tabery in the PAG-Tabery Agreements may conflict with the territories/areas that PAG and Pristec America had already agreed to provide to Plaintiffs.

186. The Letter of Intent appears to be the second example of PAG's refusal to honor an agreement made with Plaintiffs -- in this case, T.J. Earle -- because it is working behind the scenes with Tabery to undermine the interests of the Earle Brothers.

**H.    PAG Has Failed To Comply With Its Agreement To Transfer Co-Ownership Of The Pending U.S. Patent Application In Exchange For PRT's Payment Of Fees Due To The U.S. Patent Office**

187. On or about April 14, 2011, PAG filed applications for Letters Patent titled "Method for the Treatment of a Liquid, in Particular a Mineral Oil" with the United States Patent and Trademark Office ("USPTO") under Application No. US13/640932 and International

Application No. PCT/AT2011/000184, and which include Austrian Patent No. AT 509 680 B1 issued April 15, 2012 and Austrian Patent No. AT 510 227 B1 issued January 15, 2013 (collectively, the "Patent Applications") concerning certain "Inventions" owned by PAG (the Inventions and Patent Applications are referred to collectively as the "Patent Rights").

188.    In or about December 2016, PAG advised T.J. Earle that it did not have the money to pay a fee due to the USPTO for continued prosecution of the Patent Applications in the United States, which covered technology that was included in PRT's license from Pristec America.

189.    In exchange for Earle Refining's payment of the fee, PAG agreed that it would transfer co-ownership of the Patent Rights to Earle Refining, which agreed that it would pay for and have its counsel oversee the prosecution of the Patent Applications in the United States going forward.

190.    Based on this agreement and with the belief that this was the only  way to protect its substantial investment in the Pristec Technology, Earle Refining paid the approximately $10,000 fee.

191.    On January 8, 2017, after Earle Refining paid the fee, counsel for Earle Refining provided PAG with draft agreements, including an Assignment and a Joint Ownership Agreement, that would effectuate PAG's agreement to transfer co-ownership of the Patent Rights to Earle Refining.

192.    To date, PAG has refused to transfer co-ownership of the Patent Rights to Earle Refining.

I.    **Laura Admits To Embezzling And/Or Converting $500,000 Of Plaintiffs' Investments The Ventures**

193.    Upon information and belief, Laura stole, embezzled and/or converted at least $500,000 of the monies that Plaintiffs invested with the Defendants in connection with the various joint ventures.

194.    Laura admitted to T.J. Earle that the $500,000 was used by Laura to pay off a personal real estate debt.

195.    Further, upon information and belief, Laura has diverted and/or embezzled other monies invested by non-parties in Defendants.

**COUNT I**

**(Breach Of PRT Operating Agreement And
PRT License Agreement Against Pristec America)**

196.    Plaintiffs repeat and reallege all prior allegations of the Complaint as if fully set forth herein.

197.    Pursuant to the PRT Operating Agreement and PRT License Agreement, Pristec America agreed to, among other things, provide PRT with an exclusive license to the Pristec Technology and to sell and supply PRT with the Systems, Equipment, and Pristec Technology and certain other services, goods, specifications and information.

198.    Pristec America materially breached the PRT Operating Agreement and PRT License Agreement by, among other things, repeatedly failing and refusing to provide PRT with the specifications or designs for the modules and activators, which is the key component of the equipment and necessary for PRT to effectuate the agreements and its business plan, failed to provide any information regarding the costs of the activators, despite repeated requests from PRT, and other items that Pristec America is required to supply to PRT.

199.    These breaches have denied PRT the opportunity to place an order for the equipment, in breach of its rights under the PRT Operating Agreement and the PRT License Agreement.

200.    PRT has performed its obligations under the PRT Operating Agreement and PRT License Agreement.

201.    As a direct and proximate result of Pristec America's material breaches of the PRT Operating Agreement and PRT License Agreement, PRT has suffered and will continue to suffer, immediate, substantial and irreparable harm.

202.    In addition, PRT has suffered damages as a result of Pristec America's breaches.

203.    Absent an order requiring Pristec America to specifically perform its obligations under the PRT Operating Agreement and PRT License Agreement, PRT will lose its contractually bargained-for rights to the Pristec Technology.

204.    PRT has no adequate remedy at law.

**WHEREFORE**, Plaintiffs request that the Court enter judgment against Defendants awarding Plaintiffs:  (i) a preliminary and permanent injunction compelling Defendants to specifically perform Pristec America's obligations under the PRT Operating Agreement and PRT License Agreement; (ii) compensatory damages; (iii) pre- and post-judgment interest; (iv) attorneys' fees and costs; and (v) such other and further relief as the Court deems just and proper.

<u>**COUNT II**</u>
**(Breach Of License Performance Guaranty By PAG)**

205.    Plaintiffs repeat and reallege all prior allegations of the Complaint as if fully set forth herein.

206.     Under the Guaranty, upon demand by PRT, PAG agreed to perform Pristec America's obligations to PRT under the PRT License Agreement if Pristec America could not or did not perform for any reason.

207.     PRT demanded that PAG perform Pristec America's obligations under the PRT License Agreement, including but not limited to, by providing information such as specifications and pricing regarding the activators, and delivering activators to PRT.

208.     PAG materially breached the Guaranty by failing to perform Pristec America's obligations under the PRT License Agreement.

209.     PRT has performed its obligations under the Guaranty and under the PRT Operating Agreement and PRT License Agreement.

210.     As a direct and proximate result of PAG's material breaches of the Guaranty, PRT has suffered and will continue to suffer, immediate, substantial and irreparable harm.

211.     In addition, PRT has suffered damages as a result of PAG's breaches.

212.     Absent an order requiring PAG to specifically perform its obligations under the Guaranty, PRT will lose its contractually bargained-for rights to the Pristec Technology.

213.     PRT has no adequate remedy at law.

**WHEREFORE**, Plaintiffs request that the Court enter judgment against Defendant PAG awarding Plaintiffs (i) a preliminary and permanent injunction compelling PAG to specifically perform its obligations under the Guaranty and the PRT License Agreement; (ii) compensatory damages; (iii) pre- and post-judgment interest; (iv) attorneys' fees and costs; and (v) such other and further relief as the Court deems just and proper.

## COUNT III
### (Breach Of Letter Of Intent By PAG)

214.    Plaintiffs repeat and reallege all prior allegations of the Complaint as if fully set forth herein.

215.    PAG and T.J. Earle executed the Letter of Intent, which constitutes a valid and binding contract containing all necessary and material terms and is supported by valid and adequate consideration.

216.    PAG materially breached the Letter of Intent by failing and refusing to work in good faith with T.J. Earle concerning the creation of NEWCO and the definitive documents effectuating and carrying out the terms of the agreement to govern NEWCO's future operations concerning the use and commercialization of the Pristec Technology.

217.    As a direct and proximate result of PAG's material breaches of the Letter of Intent, T.J. Earle has suffered and will continue to suffer, immediate, substantial and irreparable harm.

218.    In addition, T.J. Earle has suffered damages as a result of PAG's breaches.

219.    Absent an order requiring PAG to specifically perform its obligations under the Letter of Intent, T.J. Earle will lose contractually bargained-for rights to the Pristec Technology.

220.    T.J. Earle has no adequate remedy at law.

**WHEREFORE**, Plaintiffs request that the Court enter judgment against Defendant PAG awarding Plaintiffs (i) a preliminary and permanent injunction compelling PAG to specifically perform its obligations under the March 23, 2017 Letter of Intent, including but not limited to, its obligations to discuss and negotiate in good faith with T.J. Earle concerning the creation of NEWCO and the definitive documents; (ii) compensatory damages; (iii) pre- and post-judgment interest; (iv) attorneys' fees and costs; and (v) such other and further relief as the Court deems

just and proper.

### COUNT IV
### (Breach Of Contract To Transfer Co-Ownership
### Rights In Patent Application By PAG)

221.    Plaintiffs repeat and reallege all prior allegations of the Complaint as if fully set forth herein.

222.    In exchange for Earle Refining's payment of a USPTO fee, PAG agreed that it would transfer 50% ownership of the Patent Rights to Earle Refining.

223.    Earle Refining paid the fee pursuant to this agreement and sent PAG documents effectuating the transfer of ownership.

224.    PAG refused to sign the agreements effectuating the transfer of 50% of ownership of the Patent Rights to Earle Refining, in material breach of the agreement.

225.    As a direct and proximate result of PAG's material breaches of the agreement, Earle Refining has suffered and will continue to suffer, immediate, substantial and irreparable harm.

226.    In addition, Earle Refining has suffered damages as a result of PAG's breaches.

227.    Absent an order requiring PAG to specifically perform its obligations under the agreement, Earle Refining will lose its contractually bargained-for rights to the Patent Rights.

228.    Earle Refining has no adequate remedy at law.

**WHEREFORE**, Plaintiffs request that the Court enter judgment against Defendant PAG awarding Plaintiffs (i) a preliminary and permanent injunction compelling PAG to specifically perform its obligations under the parties agreement and compelling PAG to transfer 50% ownership in the Patent Rights to Earle Refining; (ii) compensatory damages; (iii) pre- and post-judgment interest; (iv) attorneys' fees and costs; and (v) for such other and further relief as the Court deems just and proper.

35

<u>COUNT V</u>
**(Breach of Contract – Failure To Refund Deposit By Pristec America)**

229.    Plaintiffs repeat and reallege all prior allegations of the Complaint as if fully set forth herein.

230.    Pursuant to the PNE Operating Agreement and the Investor Rights Agreement, if Earle Oil declined to exercise the Southeast Option under the PNE Operating Agreement, it could either convert the $150,000 Deposit into equity in PAG or one of its subsidiaries, or demand a return of the Deposit, which Pristec America was required to refund within 10 days.

231.    Earle Oil declined to exercise the Southeast Option and demanded that Pristec America refund the Deposit.

232.    Pristec America has refused to the return the Deposit to Earle Oil in material breach of the PNE Operating Agreement and the Investor Rights Agreement.

233.    Earle Oil has performed its obligations under the PNE Operating Agreement and the Investor Rights Agreement.

234.    Earle Oil has suffered damages as a result of Pristec America's material breaches.

**WHEREFORE**, Plaintiffs request that the Court enter judgment against Defendant Pristec America awarding Plaintiffs (i) a preliminary and permanent injunction compelling Pristec America to specifically perform its obligations under the PNE Operating Agreement and the Investor Rights Agreement and return the Deposit for the Southeast License Fee to Earle Oil; (ii) compensatory damages; (iii) pre- and post-judgment interest; (iv) attorneys' fees and costs; and (v) such other and further relief as the Court deems just and proper.

## COUNT VI
### (Breach of Implied Covenant Of Good Faith
### And Fair Dealing Against Pristec America And PAG)

235.    Plaintiffs repeat and reallege all prior allegations of the Complaint as if fully set forth herein.

236.    Each of the agreements referenced herein contains an implied covenant of good faith and fair dealing requiring Pristec America and PAG to refrain from acting in a manner that will have the effect of destroying or injuring Plaintiffs' rights to receive the benefits of those agreements.

237.    The benefit to and purpose of Plaintiffs' in entering into the agreements was to commercialize the Pristec Technology and for Plaintiffs to realize a return on their substantial investment in the same.

238.    Pristec America and PAG materially breached the implied covenant of good faith and fair dealing contained in the agreements referenced herein to which they are a party by, among other things, refusing to fulfill their obligations under the referenced agreements and refusing to negotiate and work with Plaintiffs in good faith concerning the commercialization and future operations involving the Pristec Technology.

239.    The conduct of Pristec America and PAG, as described herein, violates community standards of decency, fairness and reasonableness, as well as acts that have denied, destroyed or injured Plaintiffs' rights to obtain the fruits of the agreements referenced herein.

240.    Plaintiffs have suffered monetary damages as a direct and proximate result of Pristec America and PAG's breaches of the implied covenant of good faith and fair dealing.

**WHEREFORE**, Plaintiffs requests that the Court enter judgment against Defendants (i) compensatory damages; (ii) pre- and post-judgment interest; (iii) attorneys' fees and costs; and (iv) for such other and further relief as the Court deems just and proper.

## COUNT VII
### (Fraudulent Inducement Against All Defendants)

241.    Plaintiffs repeat and reallege all prior allegations of the Complaint as if fully set forth herein.

242.    Defendants misrepresented to Plaintiffs prior to the execution of the referenced agreements that Defendants could and/or would provide Plaintiffs with the required services, goods, equipment and technology to allow Plaintiffs to bring the Pristec Technology to the market, and that Defendants had sufficient funding to provide Plaintiffs with the required services, goods, equipment and technology.

243.    Defendants  knew that these material representations to Plaintiffs were false at the time they was made.

244.    Defendants  made these material representations to Plaintiffs in order to induce the Plaintiffs to execute the agreements referenced herein.

245.    Plaintiffs reasonably relied on Defendants' fraudulent material misrepresentations in entering into the Agreements to their detriment.

246.    As a direct and proximate result of the Defendants fraudulent material misrepresentations, Plaintiffs have suffered, and will continue to suffer, damages.

247.    In making these material representations, Defendants'  acted intentionally, with malice, in wanton and willful disregard of Plaintiffs' rights, and without justification or excuse.

**WHEREFORE**, Plaintiffs request that the Court enter judgment against Defendants awarding Plaintiffs (i) a preliminary and permanent injunction compelling Defendants to specifically perform their obligations under the agreements referenced herein; (ii) compensatory damages; (iii) punitive damages; (iv) pre- and post-judgment interest; (v) attorneys' fees and costs; and (vi) such other and further relief as the Court deems just and proper.

## COUNT VIII
### (Breach Of Fiduciary Duty Against All Defendants)

248.    Plaintiffs repeat and reallege all prior allegations of the Complaint as if fully set forth herein.

249.    Defendants Pristec America and PAG owed fiduciary duties to PRT and Earle Refining pursuant to the terms of the parties' agreements and Delaware statutory and common law, including but not limited to, 6 Del. C. § 18-1101 and 6 Del. C. §§ 18-1104.

250.    Defendants breached their fiduciary duties to PRT by, among other things, diverting monies that Plaintiffs had invested in PRT, refusing to honor agreements made with Plaintiffs and working with other entities to undermine the interests of Plaintiffs.

251.    Defendants acted in a wanton, willful and malicious manner.

252.    Plaintiffs have suffered damage as a result of Defendants' breaches of their fiduciary duties.

**WHEREFORE**, Plaintiffs request that the Court enter judgment against Defendants awarding Plaintiffs (i) compensatory damages; (ii) punitive damages; (iii) pre- and post-judgment interest; (iv) attorneys' fees and costs; and (v) such other and further relief as the Court deems just and proper.

## DEMAND FOR A JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a jury trial on each and every issue so triable.

Dated:  June  16, 2017

                              **SILLS CUMMIS & GROSS P.C.**
*Attorneys for Plaintiffs*

By: /s/ *William R. Tellado*

        Thomas A. Della Croce
        William R. Tellado
        Megan L. Wiggins

        One Riverfront Plaza
        Newark, New Jersey 07102
        Telephone:  (973) 643-7000
        Fax:  (973) 643-6500
        tdellacroce@sillscummis.com
        wtellado@sillscummis.com
        mwiggins@sillscummis.com

## <u>LOCAL CIVIL RULE 11.2 CERTIFICATION</u>

Pursuant to Local Civil Rule 11.2, Plaintiffs, by their undersigned counsel, certifies to the best of my knowledge, information, and belief that the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.


<u>/s/ *William R. Tellado*     </u>
William R. Tellado

Dated:  June 16, 2017